Filed 8/19/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PAYAM MAHRAM, | B324405 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. 22STCV10339 |
| THE KROGER CO., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Elihu M. Berle, Judge. Affirmed.

Law Offices of Todd M. Friedman, Todd M. Friedman, Adrian R. Bacon, and Meghan E. George for Plaintiff and Respondent.

Davis Wright Tremaine, Jacob M. Harper, James H. Moon, and Peter K. Bae for Defendant and Appellant.

————————————

Payam Mahram used Instacart to get groceries delivered from the grocery store. Mahram sued a grocery store, but not Instacart, for an Instacart purchase where he claimed the grocer cheated him on price. The *grocer* moved to compel arbitration on the strength of a contract between Mahram and *Instacart*. The grocer did not sign this contract. The court denied the motion.

We affirm. First, contrary to Mahram's claim, Mahram did contract for arbitration—with Instacart—by signing up for its service. Second, the *trial court*, rather than the *arbitrator*, properly decided threshold questions of arbitrability, because the contract did not make unmistakably clear that Mahram had agreed to arbitrate with anyone besides Instacart. Third, the grocery store was not a third party beneficiary of the Mahram-Instacart arbitration contract.

## I

The facts are undisputed.

Instacart is an online grocery delivery service. Consumers can download the Instacart mobile application or use its services on a web browser. To create an Instacart account, they must agree to Instacart's terms of service, including its arbitration provision. Then customers can use Instacart to buy groceries online. A shopper shops for the customer's order at the grocer the customer chooses. The shopper delivers the groceries to the customer. The customer pays, and Instacart splits the take with the grocer and the shopper.

Mahram created an account with Instacart. He found the Instacart site online and clicked that he wanted to sign up. Instacart software then showed Mahram a screen like the one in our appendix (*post*, page 14).

2

As the appendix shows, the screen required Mahram either to fill in his email address and then click the button labeled "Sign up with email," or to proceed via a Facebook or Google account. Mahram used the email method.

In the space between the blank for the email address and the sign-up button were these words:  "By signing up, you agree to [Instacart's] *Terms of Service* and *Privacy Policy*."  The italics are ours, and represent the bright green color in which these words appeared to online viewers.  The green lettering contrasted with the color of the other lettering, which is gray or black. These words were in a small but readable font.

No evidence suggests Mahram had difficulty reading the font, navigating the site, or understanding the directions.  The evidence does show that signing up with Instacart and using its service was a pretty simple business.

At the time Mahram signed up, clicking on the green hyperlinked "Terms of Service" would take prospective customers to Instacart's presentation of its terms of service, which included the following language.  The bold font is in the original, but we italicize other key words.

"**For residents of the United States, you agree to the following mandatory arbitration provisions:**

"Mandatory Arbitration: If we're unable to work out a solution amicably, *both you and Instacart* agree to resolve through binding arbitration, rather than in court, any dispute, controversy, or claim arising at any time out of or relating to: (i) these Terms, including the formation, existence, breach, termination, enforcement, interpretation, validity, or enforceability thereof; (ii) access to or use of the Services, including receipt of any advertising or marketing

3

communications; (iii) any transactions through, by, or using the Services, including any goods or services purchased or sold through, by, or using the Services; or (iv) *any other aspect of your relationship or transactions with Instacart* as a consumer."

Instacart's arbitration provision also stated the Federal Arbitration Act (9 U.S.C. § 1 et seq.) "governs the interpretation and enforcement of this Arbitration Agreement and preempts all state laws to the fullest extent permitted by law."

We quote more terms of service. Again, the bold font was in the original and the italics are ours.

"**For California residents**, the arbitration shall be administered by ADR Services, Inc. ('ADR Services') under its Arbitration Rules (the 'ADR Services Rules') in effect at the time the arbitration demand is made. The ADR Services Rules are available at https://www.adrservices.com/services/arbitration-rules/. In the event of any conflict between the ADR Services Rules and this Arbitration Agreement, this Arbitration Agreement shall apply.

"For California residents, the Parties agree to submit to the jurisdiction of a single neutral arbitrator selected in accordance with the ADR Services Rules (the 'ADR Arbitrator'). The ADR Arbitrator will decide the rights and liabilities, if any, of you and Instacart. [...]

"For California residents, *you and Instacart* agree that the ADR Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any disputes relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including any claim that all or any part of this Arbitration Agreement is void or voidable. The ADR Arbitrator shall also be responsible for

determining all threshold arbitrability issues, including issues relating to whether the Terms are unconscionable or illusory and any defense to arbitration, including waiver, delay, laches, unconscionability, or estoppel."

After signing up for Instacart, Mahram used its mobile application to buy celery and cucumbers from defendant and appellant Ralphs, or more precisely The Kroger Co. d/b/a Ralphs Grocery Company.

Mahram later sued Ralphs, alleging Ralphs's pricing violated the false advertising and the unfair competition laws. In particular, Mahram alleged Ralphs raised its advertised prices once Mahram applied a coupon to his Instacart purchase.

Ralphs moved to compel arbitration by virtue of the Instacart-Mahram agreement. The trial court denied the motion without written comment.

## II

Ralphs's appeal presents three questions. Did Mahram enter a contract requiring arbitration? Answer: he did, because he signed up through a web screen plainly announcing that, "[b]y signing up, you agree to our terms of service." Second, who was to decide whether Ralphs is a third party beneficiary of that contract: the court or an arbitrator? Answer: the court, for the contract did not make it unmistakably clear Mahram had contracted for arbitration with anyone beside Instacart. Third, was Ralphs a third party beneficiary of the Instacart-Mahram contract? Answer: no, because helping Ralphs was not a motivating purpose for the parties to the contract. We thus affirm the order denying the motion to compel arbitration. Our review is independent. (*Pinnacle Museum Tower Assn. v.*

*Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.)

A

Mahram entered a contract. This holding is a necessary first step in our analysis, for arbitration is strictly a matter of contract: no contract means no arbitration. (*Coinbase, Inc. v. Suski* (2024) 144 S.Ct. 1186, 1191 (*Coinbase*).) Federal arbitration law preempts state laws standing as an obstacle to enforcing arbitration agreements according to their terms, but California state contract law determines whether the parties formed a valid agreement to arbitrate their dispute. (*Ford Motor Warranty Cases* (2023) 89 Cal.App.5th 1324, 1332, rev. granted July 19, 2023, S279969 (*Ford*).)

When Mahram clicked that he wanted to sign up with Instacart, he manifested assent to its terms of service. Mahram and Instacart then had a deal: Mahram would pay for what he ordered through Instacart, and Instacart would arrange for the purchase and delivery of the groceries Mahram ordered.

The formation of a contract requires a bargain in which there was a manifestation of mutual assent to the exchange and consideration. (Rest.2d Contracts, §17 (1).) In this case, the manifestation of mutual assent was Instacart's offer to do business on its advertised terms and Mahram's acceptance of that offer. These transactors exchanged consideration: Instacart promised to deliver Mahram's grocery orders, and Mahram promised to pay. (See Rest.2d Contracts, §§ 71, 72.)

A company and an online consumer create an enforceable contract when the company provides reasonable notice of the terms to which a consumer will be bound and the online consumer takes action—like clicking a button—manifesting

6

assent to the terms. (*B.D. v. Blizzard Entertainment, Inc*. (2022) 76 Cal.App.5th 931, 944.)

Mahram claims there is no evidence he "signed" a contract with Instacart. But Mahram did not contest the proof that the only way to sign up for Instacart is to click through the screen stating that "[b]y signing up, you agree to our Terms of Service and Privacy Policy." This evidence of assent is undisputed.

In sum, Mahram entered a contractual relationship with Instacart.

The next question is *who* is to decide the threshold issue of whether Ralphs is a third party beneficiary of the Mahram-Instacart contract. To that question we now turn.

B

Ralphs argues the trial court erred in "failing to credit" the delegation clause in the Instacart arbitration provision. The trial court did not err. Threshold issues of arbitrability in this case were questions for the trial court, not the arbitrator. Courts should not assume that the parties agreed to arbitrate arbitrability unless it is *unmistakably clear* that they did so. (*Coinbase, supra,* 144 S.Ct. at p. 1193.) *Unmistakable clarity* is the preemptive federal test. (*Ibid.*) The Instacart contract did not pass this test.

Unmistakable clarity is missing here because there is no evidence Mahram agreed to arbitrate anything—including threshold issues of arbitrability—with anyone but Instacart. With our italics, Instacart's contract language was that the arbitration agreement "applies to and governs any dispute, controversy, or claim *between you and Instacart*." But Mahram had no dispute with Instacart.

In passing, Ralphs cites two pages of the Instacart agreement referring to "retailers" and "retail partners." Ralphs does not develop this point in detail. A glance shows why. On the cited pages, the first mention of a "retailer" reveals this argument is farfetched. This first mention *distances* Instacart from a "retailer" like Ralphs. We italicize the key words.

"You agree that *Instacart does not assume responsibility* for any products, content, services, websites, advertisements, offers, or information that is provided by third parties and made available through the Services, *nor does Instacart assume responsibility for your interactions with any Third Party Provider (including a Retailer)*. If you purchase, use, or access any such products, content, services, advertisements, offers, or information through the Services or you engage with any Third Party Provider, you agree that *you do so at your own risk and that Instacart will have no liability* based on such purchase, use access, or engagement."

This language does not make it unmistakably clear that Mahram, in agreeing to a relationship with Instacart, is likewise agreeing to arbitration with a retailer like Ralphs.

There are other contractual references as well, but Ralphs has forfeited argument on these specific points by failing to give us point-by-point legal logic and authority. We will not generate arguments for a party that omits them. That would leave the other side with no fair notice of the thrust it must parry. (Cf. *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [appellants must supply the court with some cogent legal argument, for we are not bound to develop arguments for them].)

As support for its view, Ralphs cites decisions. Most are from courts outside California or are unpublished or both.

The decision in *Contec Corp. v. Remote Solution Co., Ltd.* (2d Cir. 2005) 398 F.3d 205 does not help Ralphs. If anything, it favors Mahram because, contrary to Ralphs's argument, this court wrote "just because a signatory has agreed to arbitrate issues of arbitrability with another party does *not* mean that it must arbitrate with any non-signatory." (*Id.* at p. 209, italics added.) The non-signatory entity there was a corporate descendant of the signatory. The corporate descendant had continued the same business relationship under the same ownership at the same address as the signatory. (*Id.* at p. 207.) In substance, then, the supposed non-signatory *was* the signatory, so the other side was fully on notice it would have to arbitrate with the opposing signatory and its corporate equivalents. The court held the fig leaf of evolving corporate superficialities was irrelevant. (*Id.* at p. 209.)

By contrast, Ralphs is not a corporate descendant of Instacart. Instacart is completely distinct from grocers like Ralphs, as the Instacart contract is at pains to stress.

The memorandum opinion in *Eckert/Wordell Architects, Inc. v. FJM Properties of Willmar, LLC* (8th Cir. 2014) 756 F.3d 1098 is of no assistance, because it does not recite the pertinent contractual language, making it impossible to determine whether that language was or was not unmistakably clear.

Regarding *Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1442, we agree with the decision in *Benaroya v. Willis* (2018) 23 Cal.App.5th 462, 473. "The holding of *Greenspan*—that by incorporating JAMS rules in their agreement the parties *to that agreement* gave the arbitrator the power to

decide what issues in their dispute were arbitrable—does not stand for the proposition that by incorporating JAMS rules, parties to an arbitration agreement can give the arbitrator the power to compel a *nonsignatory* to the agreement to become a party to the arbitration." (*Id*. at p. 473.) The Instacart-Mahram contract's inclusion of the ADR Arbitration Rules cannot override the contract's language limiting its applicability to disputes between Mahram and Instacart.

We do not review the unpublished and trial court decisions Ralphs also cites.

Furthermore, the applicable ADR Arbitration Rules incorporated in the Instacart-Mahram contract do not unmistakably delegate arbitrability to an arbitrator. They permit the arbitrator to decide arbitrability only if a court has not already done so. Specifically, these rules provide: "[u]nless the issue of arbitrability has been previously determined by the court, the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."

In sum, federal law preemptively requires the court to assess threshold issues when, as here, no unmistakable evidence demonstrates the contracting parties assigned that task to an arbitrator. (*Coinbase, supra*, 144 S.Ct. at p. 1193.) The key threshold issue is whether Ralphs is a third party beneficiary entitled to enforce a contract it has not signed. Mahram did not unmistakably delegate that issue to an arbitrator when he signed up with Instacart. Thus *courts* and not arbitrators must engage that threshold issue. We do so in our next section.

C

10

Ralphs was not a third party beneficiary of the Mahram-Instacart contract. Helping Ralphs, or extending contractual benefits to it, was not a "motivating purpose" behind the Mahram-Instacart arbitration agreement. (*Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 830 (*Goonewardene*).) Mahram wanted to get groceries; Instacart wanted Mahram's business for its slice of the profit. The identity and welfare of the grocer were incidental to the contracting parties. Under *Goonewardene*, Ralphs loses.

We recount *Goonewardene*.

Sharmalee Goonewardene sued her former employer Altour. She added Altour's payroll company ADP as a defendant. (*Goonewardene, supra*, 6 Cal.5th at p. 822.) Goonewardene alleged Altour had a contract with ADP to perform payroll tasks for Altour for the benefit of both Altour and its employees. (*Id.* at pp. 820 & 832.) Goonewardene sued ADP for breach of this contract, claiming ADP had improperly calculated her pay. The trial court rejected this third party beneficiary theory, but the Court of Appeal reversed. (*Id.* at pp. 823–825.)

In a landmark decision, the Supreme Court reversed the Court of Appeal and set forth governing California law on the third party beneficiary theory. (*Goonewardene, supra*, 6 Cal.5th at pp. 826–837.) This polestar now guides every modern third party beneficiary case in California.

The high court explained an indispensable factor is whether the contracting parties had a "motivating purpose" of providing a benefit to the third party. (*Goonewardene, supra*, 6 Cal.5th at p. 830.) "[T]he contracting parties must have a *motivating purpose* to benefit the third party, and not simply

11

knowledge that a benefit to the third party may follow from the contract." (*Ibid.*, italics added.)

The *Goonewardene* contract flunked this test. When they hire payroll companies, employers do not have a motivating purpose of providing a benefit to employees.

The high court reached this conclusion by way of common sense reasoning about the relationships in the case. The court rested its analysis on the general economics of the situation, and not on depositions and other evidentiary materials of which, at the demurrer stage, there had been none. (See *Goonewardene, supra*, 6 Cal.5th at pp. 822–823.) Indeed, the Altour-ADP contract was not even in the record. (*Id.* at p. 832.)

The crux of *Goonewardene*'s logic was as follows. "[T]he relevant motivating purpose is to *provide a benefit to the employer*, with regard to the cost and efficiency of the tasks performed and the avoidance of potential penalties. Although the employer intends that the payroll company will accurately calculate the wages owed to its employees under the applicable labor statutes and wage orders . . . , the employer would *reasonably expect* the payroll company to proceed with the employer's interest in mind. In short, the relevant motivating purpose of the contract is simply to assist the employer in the performance of its required tasks, not to provide a benefit to its employees with regard to the amount of wages they receive." (*Goonewardene, supra*, 6 Cal.5th 817 at p. 835, italics added.)

We follow this guiding example. We must analyze what Instacart and Mahram would "reasonably expect" in this situation. (*Goonewardene, supra*, 6 Cal.5th 817 at p. 835; cf. *Ford, supra,* 89 Cal.App.5th at p. 1339 [examining the contracting parties' "manifest intent"].)

12

Instacart and the consumers with which it contracted typically would not have central concerns about *which* grocery store supplies the celery and cucumbers.  Nothing in this case suggests Ralphs was anything special either to Instacart or Mahram.  The consumers' central goal was to get groceries without leaving home.  From Instacart's perspective, the main thing is to keep getting the consumer's payments by pleasing them with the convenient delivery of groceries.  Consumers and Instacart all want grocers to do a proper job, but—on this record—grocers are fungible to the consumers and to Instacart.

Just like Sharmalee Goonewardene, Ralphs is not a third party beneficiary of the contract it sought to enforce.  Ralphs thus has no standing to compel Mahram to arbitration.  (*See Ford, supra*, 89 Cal.App.5th at p. 1340.)

## DISPOSITION

We affirm the order and award costs to the respondent.


WILEY, J.


We concur:



STRATTON, P. J.




VIRAMONTES, J.


13

APPENDIX



**Available in Collin Co.!**

Create an account to start shopping

Email

By signing up, you agree to our Terms of Service & Privacy Policy

Sign up with email

or

Continue with Facebook

Continue with Google

Already have an account? Log in